IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JESUS VILLANUEVA, JR., individually
and on behalf of all others similarly situated,

        Plaintiff,

   v.

LIBERTY ACQUISITIONS SERVICING,
LLC; LIBERTY HOLDINGS, LLC; JAVLIN
ONE, LLC; and JAVLIN CAPITAL, LLC,

        Defendants.

No. 3:14-cv-01610-HZ (Lead Case)
No. 3:15-cv-02354-HZ

OPINION & ORDER

Joshua L. Ross
Keil M. Mueller
STOLL STOLL BERNE LOKTING
& SHLACHTER, P.C.
209 S.W. Oak Street, Suite 500
Portland, Oregon 97204

Kelly Donovan Jones
KELLY D. JONES, ATTORNEY AT LAW
819 S.E. Morrison Street, Suite 255
Portland, Oregon 97214

     Attorneys for Plaintiff

1 - OPINION & ORDER

Jeffrey I. Hasson
DAVENPORT & HASSON, LLP
12707 N.E. Halsey Street
Portland, Oregon 97230

      Attorney for Defendant Liberty Acquisitions Servicing, LLC

Robert E. Sabido
Daniel C. Peterson
COSGRAVE VERGEER KESTER, LLP
888 S.W. Fifth Avenue, Suite 500
Portland, Oregon 97204

      Attorneys for Defendant Liberty Holdings, LLC

Jonathan M. Radmacher
McEwen Gisvold, LLP
1100 S.W. Sixth Avenue, Suite 1600
Portland, Oregon 97204

Brian C. Buescher
KUTAK ROCK, LLP
The Omaha Building
1650 Farnam Street
Omaha, Nebraska 68102

      Attorneys for Defendants Javlin One, LLC & Javlin Capital, LLC

HERNANDEZ, District Judge:

      Plaintiff Jesus Villanueva brings this putative class action against Defendants Liberty

Acquisitions Servicing, LLC ("LAS"), Liberty Holdings, LLC ("Holdings"), Javlin One, LLC

("Javlin One"), and Javlin Capital, LLC ("Javlin Capital").  Plaintiff brings a claim under the Fair

Debt Collection Practices Act, 15 U.S.C. §§ 1692-1692p ("FDCPA"), against LAS and Holdings.

Plaintiff also brings a breach of fiduciary duty claim against those two Defendants.  Plaintiff

brings a fraudulent transfer claim against all four Defendants.

      Plaintiff moves to certify a class on the FDCPA claim and the fraudulent transfer claim.

2 - OPINION & ORDER

Plaintiff further seeks appointment of current counsel as class counsel. I grant the motion.

BACKGROUND

This case involves claims of unlawful debt collection practices and a fraudulent transfer. As to the debt collection claim, Plaintiff alleges that he had a Demand Deposit Account (DDA) with U.S. Bank which allowed overdrafts in certain situations. First Am. Compl. ¶ 12, ECF 89[1]. Although overdraft fees were charged, U.S. Bank did not charge interest on overdrawn DDA accounts. Id. U.S. Bank had no contractual right to do so. Id. Generally, U.S. Bank would attempt to collect the overdue fees from DDA account holders but eventually, if unsuccessful, U.S. Bank would "charge off" the delinquent accounts, declare the debts uncollectable, and claim certain tax advantages as a result. Id. ¶ 13.

Plaintiff alleges that LAS is a wholly-owed subsidiary of Holdings. Id. ¶ 14. Plaintiff also alleges that Holdings also owns Liberty Acquisitions II, which is not a named Defendant in this case. Id. According to Plaintiff, U.S. Bank sold the "charged off" debts to United Credit Recovery, LLC, which sold them to Liberty Acquisitions II, which sold them to LAS. Id.[2]

Plaintiff apparently incurred DDA account overdraft charges and did not pay them. See

---

[1] I cite to the allegations in the First Amended Complaint of the 14-1610 case because it is the lead case and its allegations are identical to those in the operative Complaint in the 15-2354 case. All docket entry citations are also to the 14-1610 case because it is the lead case.

[2] In opposing Plaintiff's class certification motion, LAS relies on the deposition testimony of Thomas Scott, LAS's Rule 30(b)(6) designee, to assert that LAS, Liberty I, LLC, and Liberty II, LLC were all separate Delaware limited liability companies and Holdings was the sole member of each one. Hasson Decl. Ex. 1 ("Scott Dep. Vol I") 80:17-25, ECF 128-1. Scott also testified that Liberty I and Liberty II purchased portfolios of debt and that LAS's business was debt collection. Mueller Decl. Ex. 2 ("Scott Dep. Vol II") 14:4-7, 14:13-23, ECF 120-2. After acquiring the debt, Liberty I and Liberty II would assign the debt pool to LAS for collection. Id. 15:5-18.

3 - OPINION & ORDER

id. ¶ 20 (Plaintiff was sued for alleged overdraft charge).  On September 13, 2013, LAS sued

Plaintiff for the DDA overdraft debt in Jackson County Circuit Court.  Id.  There, LAS alleged

that Plaintiff owed an unpaid balance and interest.  Id. ¶¶ 24, 29.  The Jackson County Circuit

Court entered a default judgment on December 13, 2013, which included the principal amount

owed, as well as prejudgment and postjudgment interest.  Id. ¶¶ 27, 28.  Eventually, LAS

garnished Plaintiff's wages to satisfy the judgment.  Id. ¶ 30.

Plaintiff alleges that by attempting to collect charged-off DDA account debts with

interest, in lawsuits and demand letters, LAS and Holdings violated various provisions of the

FDCPA.  Id. ¶¶ 29, 32, 33, 50-51.  Plaintiff seeks actual and statutory damages as well as

attorney's fees and costs.  Id.  Plaintiff alleges that LAS and Holdings are both liable on the

FDCPA claim because LAS was acting as Holdings's agent or alter ego.  Id. ¶ 53; see also id. ¶¶

38-41 (alter ego allegations).

Javlin One and Javlin Capital are not named as Defendants in the FDCPA claim but they

are, along with LAS and Holdings, Defendants in the fraudulent transfer claim.  Id. ¶¶ 54-62.  In

Count One of that claim[3], Plaintiff alleges that after the initial Complaint in the 14-1610 case was

filed[4], LAS and Holdings transferred, or caused to be transferred, approximately $7.6 million to

_____

[3] Count Two of the fraudulent transfer claim was dismissed in an August 19, 2016
Opinion & Order, ECF 118.

[4] The 14-1610 case was filed October 10, 2014 with Andrea Jenkins-Brown as the named
Plaintiff.  ECF 1.  LAS and an individual later dismissed by Plaintiff, were the named
Defendants.  Id.  The case was assigned to Magistrate Judge Stewart.  ECF 2.  Later, Judge
Stewart granted an extension of time to complete class discovery due to the illness of Jenkins-
Brown, the putative class representative.  ECF 73.  Because of her illness, Jenkins-Brown sought
leave to amend the Complaint to, inter alia, substitute Villanueva as Plaintiff.  ECF 76, 78.  In a
February 26, 2016 Order, Judge Stewart granted that motion.  ECF 87.  Villanueva was
substituted as Plaintiff and the Javlin Parties were added as Defendants.  Id.  The First Amended

the Javlin Parties to pay off a preexisting debt allegedly owed to Javlin One by Liberty I or

Liberty II.  Id. ¶ 55.  Plaintiff alleges that the Javlin Parties are affiliates of LAS and Holdings,

that the Javlin Parties knew or had reasonable cause to believe that the $7.6 million transfer

would render LAS and Holdings insolvent, and that as a result of the transfer, Plaintiff and

putative class members are limited in their ability to collect monetary damages from LAS and

Holdings that may be awarded to them on the FDCPA claim.  Id. ¶¶ 57-58.  Plaintiff seeks

equitable relief, including the avoidance of the transfer necessary to satisfy any such money

damages, and an order allowing Plaintiff to levy execution of any judgment obtained in this case

against the funds transferred to the Javlin Parties.  Id. ¶ 59.

## STANDARDS

Under Federal Rule of Civil Procedure 23, a suit may go forward as a class action if:

> (1) [T]he class is so numerous that joinder of all members is impracticable; (2)
> there are questions of law or fact common to the class; (3) the claims or defenses
> of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the
> class.

Fed. R. Civ. P. 23(a).  In addition to satisfying the four Rule 23(a) criteria, a class action may be

maintained only if one of the Rule 23(b) criteria is met.  Fed. R. Civ. P. 23(b).  Here, plaintiffs

rely on Rule 23(b)(3) under which the Court must find "that the questions of law or fact common

to class members predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for fairly and efficiently adjudicating the

controversy."  Fed. R. Civ. P. 23(b)(3).

---

Complaint was filed on March 9, 2016.  ECF 89, 90.  The case was reassigned to me on July 18,
2016.  ECF 116.

5 - OPINION & ORDER

The decision to grant or to deny class certification is within the trial court's discretion. Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). It is Plaintiff's burden to establish compliance with Rule 23. Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1067 (9th Cir. 2014).

A class may be certified only if the court is satisfied "after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied." Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) (internal quotation marks omitted). A class may be certified as to one or more claims without certifying all of the claims alleged in the complaint. Fed. R. Civ. P. 23(c)(4).

For purposes of ruling on a motion to certify a class, the court takes the substantive allegations of the complaint as true. In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 691 F.2d 1335, 1342 (9th Cir. 1982). However, the court is also required to consider the nature and range of proof necessary to establish those allegations. Id.

The determination of class certification does not require or permit a preliminary inquiry into the merits. Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir. 1975). And, an extensive evidentiary showing by the plaintiff is not required as long as the court has sufficient material before it to determine the nature of the allegations and to rule on compliance with the requirements of Rule 23. Id.

DISCUSSION

I. The Proposed Class

Plaintiff proposes the following class definition:

All natural persons against whom Liberty Acquisitions Servicing, LLC filed a

lawsuit and obtained a judgment based on alleged non-payment of a debt
originating from a U.S. Bank National Association demand deposit account and
incurred for personal, family or household purposes where: (a) the lawsuit alleged
a right to, and the judgment included, prejudgment interest at a contractual interest
rate purportedly set forth in the agreement governing the debt; and (b) Liberty
Acquisitions Servicing, LLC collected or attempt[ed] to collect on the judgment
on or after October 10, 2013.

Pl.'s Mot. for Class Cert. 1, ECF 119.

Plaintiff argues that the class certification motion should be granted because the class is

so numerous that joinder is impossible, there are common questions of law and fact, Plaintiff's

claims are typical of those of the class members, Plaintiff will adequately represent the class,

common questions of law or fact predominate, and a class action is superior to other methods of

adjudication.  Defendants challenge every aspect of the analysis.

II.  Rule 23(a) Factors

    A.  Numerosity

Rule 23(a)(1) requires that the "class [be] so numerous that joinder of all members is

impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  Cases from the Ninth Circuit and this Court support a

conclusion that a class of fewer than 100 potential class members and as low as forty, satisfies

the numerosity requirement.  E.g., Jordan v. Cty. of L.A., 669 F.2d 1311, 1319 & n.10 (9th Cir.

1982) (stating inclination "to find the numerosity requirement . . . satisfied solely on the basis of

the number of ascertained class members, i.e., 39, 64, and 71," and listing thirteen cases in which

courts certified classes with fewer than 100 members), vacated on other grounds, 459 U.S. 810

(1982); Or. Laborers-Emp'rs Health & Welfare Trust Fund v. Philip Morris, 188 F.R.D. 365, 372

(D. Or. 1998) ("This district has held that, as a 'rough rule of thumb,' approximately forty

members is sufficient to satisfy the numerosity requirement.") (quoting Wilcox Dev. Co. v. First

Interstate Bank of Oregon, N.A., 97 F.R.D. 440, 443 (D. Or. 1983)).  "[W]here a class is large in numbers, joinder will usually be impracticable." Jordan, 669 F.2d at 1319.

Plaintiff anticipates that the proposed class will include in excess of 14,000 members.  In support of the motion, Plaintiff's counsel Keil Mueller states that in response to Plaintiff's requests for production, LAS produced several spreadsheets containing data regarding U.S. Bank DDAs that LAS serviced.  Mueller Decl. ¶ 18, ECF 120.  LAS's counsel represented to Plaintiff that this data was obtained from the Q-Law record keeping system LAS used for the debts that it serviced.  Id.  Mueller, along with staff at his law firm acting at his direction and under his supervision, analyzed that data.  Id.  Based on the analysis, Mueller states that the data indicates, among other things, that:

> (1) LAS sought to collect interest on U.S. Bank DDA debt at purported contractual rates on over 21,000 accounts; (2) on or after October 10, 2013, LAS sent letters or correspondence requesting payment to LAS of amounts in satisfaction of alleged DDA debt to over 17,000 individuals against whom LAS had filed a lawsuit to collect the alleged debt and obtained a judgment; (3) in approximately 14,000 of those cases, LAS's data indicates that it sought prejudgment interest at purported contractual interest rates; (4) of the 17,000 individuals, the most that LAS collected from any one individual is approximately $11,000, including principal; and (5) LAS collected $5,000 or more from fewer than 40 of the 17,000 individuals.

Id.

Defendants' arguments that Plaintiff fails to meet the numerosity requirement are unconvincing.  LAS[5] does not directly challenge the analysis of the data it produced to Plaintiff.  But, it suggests that the 14,000 class member estimate includes "[s]ome people" who paid a total

---

[5] Holdings, which is represented by its own counsel, filed a separate opposition to the class certification motion but joins in LAS's opposition.  ECF 130.  Holdings also argues there is no basis on which to certify a claim against it because it was not the debt collector.  Holdings's independent argument is addressed below.

amount less than the principal, court costs, and attorney's fees awarded in the judgment, and less than the statutory interest due on the account under various state laws. According to LAS, such people were not "damaged" under Plaintiff's definition. If, LAS continues, there was an FDCPA violation, "these people" would be part of a statutory damage pool and, LAS argues, because there are no statutory damages available under the FDCPA due to LAS presently having zero net worth, "these people" should not be considered for numerosity purposes.

While LAS does not expressly state this, I assume that the "some people" who paid a total less than what was awarded in a judgment were those who settled for a lesser amount post-judgment or those from whom the total amount could not be fully garnished. In any event, LAS's vague references to "some people" and "these people" provide no basis for concluding that the class would drop from an estimated 14,000 to fewer than forty. Additionally, this is a damages issue, not a liability issue. The alleged FDCPA violations encompass false representations, false characterizations, threatening to take action that could not be legally taken, and using false representations and deceptive means to collect or attempt to collect a debt. LAS's argument does not suggest that the class members who actually paid less than what was awarded to LAS in a judgment lack a claim for statutory damages for these alleged violations.[6]

The Javlin Parties contend that the numerosity requirement cannot be established by Mueller's explanation and statements in his Declaration. I disagree. District courts in the Ninth Circuit have relied on similar evidence as adequate. In a 2014 decision, the District of Nevada squarely rejected the argument: "Contrary to Click Media's arguments[,] the Court may rely on Kristensen's counsel's Declaration, which includes a summary of the data obtained from

---

[6] LAS's argument regarding the effect of its current zero net worth is discussed below.

T–Mobile." Kristensen v. Credit Payment Servs., 12 F. Supp. 3d 1292, 1304 (D. Nev. 2014)

(citing Fed. R. Evid. 1006; Keilholtz v. Lennos Hearth Prods., Inc., 268 F.R.D. 330, 337 n.3

(N.D. Cal. 2010); Parkinson v. Hyundai Motor Am., 258 F.R.D. 580, 599 (C.D. Cal. 2008)).

A class estimate of 14,000 members satisfies the numerosity requirement.

B.  Commonality

Under Rule 23(a)(2), Plaintiffs must establish that there "are questions of law or fact

common to the class." Fed. R. Civ. P. 23(a)(2).  Generally, Rule 23(a)(2)'s requirements "have

been construed permissively, and all questions of fact and law need not be common to satisfy the

rule." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 981 (9th Cir. 2011) (internal quotation

marks and brackets omitted).  Nonetheless, the Supreme Court has recognized that "any

competently crafted class complaint literally raises common 'questions.'" Wal-Mart Stores, Inc.

v. Dukes, 564 U.S. 338, 349 (2011) (internal quotation marks omitted).  As a result, the Court

explained that "reciting these questions is not sufficient to obtain class certification." Id.

(internal quotation marks omitted).  Instead, "[c]ommonality requires the plaintiff to demonstrate

that the class members have suffered the same injury" which does not "mean merely that they

have all suffered a violation of the same provision of law." Id. at 349-50.  The claims "must

depend upon a common contention" and that common contention "must be of such a nature that

it is capable of classwide resolution—which means that determination of its truth or falsity will

resolve an issue that is central to the validity of each one of the claims in one stroke." Id. at 350.

According to the Court, "[w]hat matters to class certification is not the raising of common

'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate

common *answers* apt to drive the resolution of the litigation." Id. (internal quotation marks and

ellipsis omitted).

To establish commonality, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). "[T]here need be only a single issue common to all members of the class." Or. Laborers-Emp'rs Trust, 188 F.R.D. at 373 (internal quotation marks omitted). "[W]hen the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected." Id. (internal quotation marks omitted).

Plaintiff argues that the commonality requirement is satisfied for the FDCPA claim because the proposed class members' claims arise out of the following common core of facts:

(1) LAS collected or attempted to collect debts originating from U.S. Bank customer DDAs from Plaintiff and the members of the proposed class;

(2) the debts incurred by Plaintiff and the members of the proposed class were incurred for personal, family, or household purposes;

(3) the U.S. Bank account agreements that apply to Plaintiff's account and to the accounts of proposed class members are materially identical in regard to the contractual interest issue;

(4) the judgments obtained by LAS against Plaintiff and the members of the proposed class all included prejudgment interest at the purported contractual interest rates alleged by LAS in the complaints it filed; and

(5) after obtaining these judgments, LAS attempted to collect on the them, including the prejudgment interest at the contractual interest rates, by, among other things, sending letters and

correspondence to Plaintiff and the members of the proposed class.

As to the fraudulent transfer claim, the common facts are that (1) after the original Complaint in this lawsuit was filed, LAS and Holdings transferred approximately $7.6 million to the Javlin Parties; and (2) the Javlin Parties knew or had reasonable cause to believe, that the transfer from LAS and Holdings would render LAS and Holdings insolvent and potentially unable to satisfy any award of monetary damages to Plaintiff and members of the proposed class.

Additionally, Plaintiff contends common legal issues exist as well. For the FDCPA claim, Plaintiff lists eight common legal issues:

(1) the interpretation of the U.S. Bank account agreements at issue and whether they allowed U.S. Bank, and by extension LAS, to charge interest on the DDA debt;

(2) whether LAS collected or attempted to collect amounts not expressly authorized by the agreement creating the debt or permitted by law in violation of the FDCPA, § 1692(l);

(3) whether Holdings is jointly liable for LAS's alleged FDCPA violation; and

(4) whether the letters sent by LAS in an effort to collect on judgments that included prejudgment interest at a contractual rate to which LAS alleged it was entitled,

(a) were false, deceptive, or misleading misrepresentations in the collection of the debt in violation of the FDCPA, § 1692e;

(b) falsely represented the character, amount, or legal status of the debt in violation of the FDCPA, § 1692(e)(2)(A);

(c) threatened to take an action that could not legally be taken in violation of the FDCPA, § 1692e(5);

(d) constituted the use of a false representation or deceptive means to collect or

attempt to collect a debt in violation of the FDCPA, § 1692e(10); and

       (e) constituted an unfair or unconscionable means to collect or attempt to collect the debt in violation of the FDCPA, § 1692f.

As to the fraudulent transfer claim, Plaintiff asserts that at a minimum, it will involve the common legal issue of whether the Javlin Parties are affiliates of LAS and Holdings.

Defendants argue that Plaintiff fails to establish commonality as to either claim. First, LAS argues that because it obtained judgments in Colorado, Nebraska, Oregon, Utah, and Washington, differing state laws create individual issues inconsistent with a finding of commonality in a nationwide class. Second, LAS argues that bankrupt debtors should be excluded. Third, LAS argues that the arbitration clause contained in the account agreements will require individualized determinations.

The Javlin Parties also argue that Plaintiff cannot establish commonality. They contend that because the FDCPA allows the collection of interest authorized by state law, state statutory interest laws can defeat a FDCPA claim. Accordingly, they suggest that each state's prejudgment interest statute will create individualized inquiries as to the merits of the claim. They also contend that commonality fails based on what they assert is a disagreement among class members about which DDA Agreement applies. Further, they suggest Plaintiff fails to submit any evidence that he, or any member of the proposed class, signed the DDA Agreement. Finally, the Javlin Parties argue that as to the fraudulent transfer claim, Plaintiff's commonality argument fails because Plaintiff does not show which state's law applies to that claim.

    1. State Law Differences

LAS argues that differences in state law arise in three different contexts: preclusion,

13 - OPINION & ORDER

interest statutes, and the Rooker-Feldman doctrine.

        a. Preclusion

According to LAS, issue and claim preclusion law for each state is different.  LAS argues

that the preclusive effect of an award of prejudgment and postjudgment interest in the variety of

judgments LAS obtained against the proposed class members (trial judgments, default

judgments, and stipulated judgments) will vary depending on each state's preclusion law.  Thus,

the argument goes, individual inquiries, at least by state, are required.

        LAS and Holdings raise issue and claim preclusion as affirmative defenses.  LAS Answer

¶¶ 2.6, 2.7, ECF 95; Holdings Answer ¶ 75, ECF 105.  While "[a]ffirmative defenses should be

considered in making class certification decisions[,] . . . [c]ourts traditionally have been reluctant

to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be

available against individual members."  Smilow v. Sw. Bell Mobile Sys., Inc., 323 F.3d 32, 39

(1st Cir. 2003) (internal quotation marks omitted); see also Cameron v. E.M. Adams & Co., 547

F.2d 473, 478 (9th Cir. 1986) (state law statute of limitations defense was "not sufficient . . . to

negate the predominance of the common issue.").

        Accepting as true for the purposes of this Opinion only that each state's preclusion law

varies in its treatment of prejudgment and postjudgment interest depending on the type of

judgment entered, this will be a common question as to each state.  And while the issue may

require subclasses at some point, it does not defeat the common question of initial FDCPA

liability on a national scale.  See Fed. R. Civ. P. 23(c)(1)(C) (court may alter or amend

certification order before final judgment); United Steel, Paper & Forestry, Rubber, Mfg. Energy,

Allied Indus. & Serv. Workers Int'l Union, AFL-CIO, CLC v. ConocoPhillips Co., 593 F.3d 802,

809 (9th Cir. 2010) ("district court retains the flexibility to address problems with a certified

class as they arise"; further explaining that "'neither the possibility that a plaintiff will be unable

to prove his allegations, nor the possibility that the later course of the suit might unforeseeably

prove the original decision to certify the class wrong, is a basis for declining to certify a class

which apparently satisfies'" the requirements of Rule 23) (quoting Blackie, 524 F.2d at 901);

Rodman v. Safeway Inc., No. 11-CV-03003-JST, 2015 WL 2265972, at *3 (N.D. Cal. May 14,

2015) (rejecting the defendant's argument that individual issues regarding waiver of a contractual

provision required decertification of the class; initial issue of whether customers' conduct

constituted waiver was a classwide legal question and individual issues regarding actual waiver

could be addressed through later subdivision of the class if necessary and appropriate).

Moreover, although discussing the merits of a claim or affirmative defense is typically not

part of the class certification analysis, Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003) (the

court should not "advance a decision on the merits to the class certification stage"), merits issues

may be considered to the extent they are relevant to the Rule 23 analysis.  Amgen Inc. v. Conn.

Ret. Plans & Trust Funds, —— U.S. ——, 133 S. Ct. 1184, 1194–95 (2013).

In this case, Judge Stewart previously rejected the argument that issue or claim preclusion

are available to Defendants to compel arbitration or to defeat the FDCPA claim.  In late 2014,

LAS moved to compel arbitration.  In responding to then-Plaintiff Jenkins-Brown's argument that

LAS had failed to establish through properly authenticated, admissible evidence what specific

DDA Agreements, debts, or rights LAS acquired and other relevant facts, LAS responded that it

did not need to offer evidence or testimony showing its acquisition of Jenkins-Brown's debt to

U.S. Bank or that her debt was governed by the DDA Agreement.  Mar. 5, 2015 F&R at 6-7, ECF

23, adopted by J. Hernandez (D. Or. Apr. 16, 2015), ECF 25.  LAS argued that based on the

default judgment entered against Jenkins-Brown, which had been paid in full, Jenkins-Brown

was precluded by *res judicata* from arguing any facts contrary to the allegations that led to that

judgment.  Id. at 7.

> Judge Stewart disagreed.  She explained:

> [D]efendants read too much into those allegations which do not establish several
> facts central to their current motion.  By allowing a default judgment to be entered
> against her in the state court case, Jenkins-Brown is precluded only from
> relitigating that she had a DDA which she overdrew and became obligated to pay
> $585.78 to U.S. Bank and then to Liberty who purchased her "account, contract,
> and claim."  However, nothing in the state court complaint refers to or establishes
> the terms and conditions applicable to Jenkins-Brown's DDA with U.S. Bank, and
> more importantly, whether Jenkins-Brown ever entered in the generic and
> unsigned DDA Agreement containing the arbitration clause at issue.

Id. at 7-8.  Although this discussion concerned the effect of the default judgment on the DDA

Agreement's arbitration provision, Judge Stewart properly noted the limited facts established by

the default judgment.

In a July 29, 2015 F&R, Judge Stewart addressed LAS's argument that the FDCPA claim

required dismissal because of issue preclusion.  July 29, 2015 F&R 10-13, ECF 55, adopted by J.

Hernandez (D. Or. Sept. 14, 2015), ECF 67.  Judge Stewart noted that the argument made by

LAS was like the argument it had made previously in support of the motion to compel

arbitration.  Id. at 11 ("As in its earlier Motion to Compel Arbitration, Liberty asserts that the

terms of the DDA agreement, including interest and arbitration, have been adjudged recoverable

by the state court and cannot be relitigated here.").  Judge Stewart, quoting her analysis in the

March 5, 2015 F&R, noted that she had "rejected that preclusion argument." Id.

Then, she explained:

16 - OPINION & ORDER

The same analysis applies here. None of the issues litigated and reduced to the default judgment in state court involves Liberty's debt collection practices which are at issue here. False, deceptive, or misleading representations within collection complaints, made during litigation, and communicated post-judgment, constitute FDCPA violations. *See Donohue v. Quick Collect, Inc.*, 592 F3d 1027, 1033 (9th Cir 2010) (false, deceptive, or misleading allegations in state court complaint concerning amount of debt violates 15 USC §§ 1692e and 1692f); *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F3d 939, 952 (9th Cir 2011) (statements in debt collector's discovery requests violate 15 USC §§ 1692e and 1692f); *Fox v. Citcorp Credit Servs., Inc.*, 15 F3d 1507, 1515 (9th Cir 1994) (wrongful garnishment actionable). Jenkins-Brown alleges that Liberty violated the FDCPA by repeatedly sending her and other class members collection letters which demanded contractual interest that it was not entitled to collect. Liberty then reiterated those false representations in state court complaints, often resulting in default judgments that incorporated the amount of unlawful interest. Nothing in the prior state court action referred to or established that the terms of the DDA agreement between U.S. Bank and Jenkins-Brown allow for the collection of contractual interest, leaving open the door to the claim in this action that Liberty asserted its right to collect interest. Whether Liberty obtained a default judgment based on its misrepresentations after its alleged unlawful collection practices had occurred is not relevant to the FDCPA claim. *See Flores v. Quick Collect, Inc.*, Civ. No. 06-1564-AA, 2007 WL 2769003, at *3 (D Or Sept. 18, 2007) (entry of a default judgment against plaintiff in state court did not bar an FDCPA claim in federal court based on attempts to collect that judgment).

In sum, there is simply no identity of issues between Jenkins-Brown's FDCPA claim in this case and the underlying state court default judgment to permit issue preclusion.

Id. at 12-13.

Given Judge Stewart's conclusion, it is likely that the issue or claim preclusion law of *any* state is irrelevant to any proposed class member's FDCPA claim. Because there must be some overlap in claims (which there is not) or in issues (which there is not) for preclusion to apply, it does not matter that Nebraska, for instance, may consider many types of judgments to be on the merits for purposes of claim or issue preclusion while another state does not. As Judge Stewart explained, there is a lack of identity of issues between the underlying state court actions brought

by LAS and the FDCPA claim in this case.  Accordingly, the likelihood of state-by-state adjudication of the preclusion issue is small.

The issue or claim preclusion affirmative defense, to the extent it is relevant at all, is not relevant to many of the common issues establishing the FDCPA claim.  For example, it will not impact the classwide consideration of whether the DDA Agreements allowed for the collection of contractual interest, whether the debts incurred by the class members were for personal, family, or household purposes, whether the judgments obtained by LAS included contractual interest, LAS's actual conduct in collecting the debt, and more.  It also has no impact on the fraudulent transfer claim.  And, if it is relevant, subclasses by state can be created at a later date if required.

b.  Interest Statutes

Next, LAS contends that differing state laws regarding entitlement to interest preclude a finding of commonality.  As I understand LAS's argument, it contends that because each state has its own interest statutes, any award of actual damages based on LAS having obtained contractual interest to which it was not entitled would need to be offset by the statutory interest it was permitted to seek, even if it did not previously seek it.  LAS contends that given the different state interest statutes, individual calculations of the amount of statutory interest due under each of the various state statutes would need to be made to determine the amount of actual damages to each class member.

Plaintiff responds that LAS cites no authority for offsetting Plaintiff's, or any other class member's, actual damages by an amount of statutory interest that LAS chose not to seek. Whether an offset is allowed at all is likely determinable on a classwide basis.  Once that determination is made, and if it is appropriate to consider, Plaintiff argues that this is a damages

issue, not a merits issue and thus, should not preclude certification.  The law in the Ninth Circuit is that "damage calculations alone cannot defeat certification." Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1094 (9th Cir. 2010) (the "'amount of damages is invariably an individual question and does not defeat class action treatment'") (quoting Blackie, 524 F.2d at 905); see also Jimenez v. Allstate Ins. Co., 765 F.3d 1161, 1165 (9th Cir. 2014) ("so long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed [does] not defeat class certification"), cert. denied, 135 S. Ct. 2835 (2015).

Individualized actual damages in FDCPA claims have not prevented other courts from finding class certification appropriate.  E.g., Eatmon v. Palisades Collection, LLC, No. CIV A 2:08-CV-306, 2011 WL 147680, at * 12 (E.D. Tex. Jan. 18, 2011) (in case with FDCPA claim, court explained that "the possibility of individualized proof on actual damages is not necessarily a bar to class certification" and concluded that common issues predominated); Mund v. EMCC, Inc., 259 F.R.D. 180, 184 (D. Minn. 2009) (acknowledging similarity of injury caused by the defendant's letter sufficient to satisfy commonality and typicality requirements even if "the extent of the monetary damages suffered by individual class members varies").

Plaintiff also argues that if it is necessary to calculate an offset for statutory interest from actual damages, the determination will be manageable.  There are only five states, each with an easily obtainable statutory interest rate.  The amount of interest, Plaintiff asserts, is a straightforward mathematical calculation that can be performed using the data produced by LAS.

Although the Javlin Parties assert that their statutory prejudgment interest argument goes

to the merits, it is also a damages argument.[7]  The Javlin Parties contend that because § 1692f(1) allows a debt collector to seek interest expressly authorized by the agreement creating the debt *or* authorized by state law, the merits of each individual claim cannot be resolved without applying each state's prejudgment interest statute.  The FDCPA claim here, however, targets the collection of contractual interest, not statutory interest.  Plaintiff does not dispute that LAS could have sought statutory prejudgment or postjudgment interest.  And it is only that statutory interest that is "authorized by state law."  The question in the FDCPA claim is whether the DDA Agreement at issue authorized the collection of contractually-based interest.  The portion of § 1692f allowing the collection of interest authorized by state law does not impact the merits of these claims.  Thus, the Javlin Parties' argument is essentially the same as the one made by LAS which is that LAS was entitled to collect statutory interest and thus, any actual damages awarded for the FDCPA claim must be offset by the statutory interest LAS was permitted to collect.  For the reasons explained above, this will be a damages inquiry, not an issue that goes to the merits.

Moreover, the cases cited by Defendants are inapposite.  In Diaz v. Kubler Corp., 785 F.3d 1326 (9th Cir. 2015), the issue was only whether the statutory interest collected by the defendant was or was not authorized by state law.  Here, the issue concerns contractual interest on the DDA debt, not statutory interest.  Diaz is not relevant.  In Powers v. Credit Management Services, 776 F.3d 567 (8th Cir. 2015), the plaintiffs argued that the defendant violated the FDCPA by seeking statutory interest.  The plaintiffs' theory was that the defendant was not entitled to collect statutory interest from consumers who contested a collection lawsuit because

---

[7]  The Javlin Parties also argue that the DDA Agreements allowed LAS to collect contractual interest.  This is clearly a classwide merits argument which is inappropriate to consider at this juncture.

that challenge made the debt unliquidated which precluded an award of prejudgment interest.  Id. at 571.  The court determined that individual inquiries were required to resolve the claim, including review of every state court collection suit to determine if the defendant had claimed prejudgment interest at the statutory rate, if the defendant had collected such interest, and if the underlying consumer transaction showed that the defendant had a legitimate claim to statutory interest pursuant to the Nebraska statute.  Id.[8]

Here, again, the issue is LAS's right to collect contractual interest, not statutory interest. Based on the U.S. Bank DDA Agreements which Plaintiff asserts were the same regarding interest, there is a common legal question of whether those agreements allowed for contractual interest on the unpaid debt.  There is no suggestion in this record that LAS's conduct in attempting to collect the debt was individualized in terms of the inclusion of contractual interest. The records already provided by LAS reflect that LAS claimed contractual interest and collected it.  The individual inquires as recited by the Powers court are not present here.

### c. Rooker-Feldman Doctrine

The third issue raised by LAS in its argument that individualized state law issues preclude a finding of commonality, is based on the Rooker-Feldman doctrine.  The doctrine prohibits federal courts from exercising appellate review over final state court judgments.  Reusser v.

---

[8] The appellate court also concluded that examining whether the plaintiffs' legal theory had been litigated by a class member and resolved by the state court for issue preclusion purposes was required.  Id. at 571-72.  The Eighth Circuit reversed the district court's determination that the underlying state court judgments were irrelevant because the plaintiffs were contesting the debt collection practices not whether the debt was owed.  Id. at 572 n.3.  Here, as described above, the decisions in this case are in accord with the district court's decision in Powers.  Given that the appellate decision is not controlling on this Court, for the reasons previously explained I do not find the issue preclusion affirmative defense to present significant individualized issues.

Wachovia Bank, N.A., 525 F.3d 855, 858-59 (9th Cir. 2008).

Judge Stewart addressed this issue in her July 29, 2015 F&R.  LAS moved for summary judgment against then-Plaintiff Jenkins-Brown's FDCPA claim based on Rooker-Feldman. Judge Stewart explained that the "basic premise" of the doctrine was that "'a federal district court does not have subject matter jurisdiction to hear a direct appeal from the final judgment of a state court.'"  July 29, 2015 F&R at 7 (quoting Noel v. Hall, 341 F.3d 1148, 1154 (9th Cir. 2003)). She noted that the doctrine occurs when a federal plaintiff seeks relief from a state court judgment based on an allegedly wrong decision by a state court.  Id.  It also applies, she stated, when the federal action is a "'*de facto* appeal from a state court judgment.'"  Id. (quoting Reusser, 525 F.3d at 859).  In contrast, she explained,

> the doctrine does not apply when a federal plaintiff presents an independent claim that asserts "as a legal wrong that an adverse party engaged in conduct which prevented a federal plaintiff from presenting his claim in court.  The focus of such claim is not on whether a state court committed legal error, but rather on a wrongful act by the adverse party."

Id. (quoting Reusser, 525 F.3d at 859) (brackets omitted).

Judge Stewart concluded that the "*Rooker-Feldman* doctrine simply does not apply here." Id. at 8.  She rejected LAS's contention that by complaining of injuries caused by the entry of the state court judgment, Jenkins-Brown was inviting a federal court to review and reject that judgment.  Id.  Judge Stewart explained:

> Jenkins-Brown does not allege that the state court made a mistake when entering the default judgment against her.  Instead, the Complaint alleges that, both before, during and after entry of the state court judgment, [LAS] claimed a right to interest on the unpaid principal overdraft debt even though the DDA agreements do not provide for imposition or charges of any interest upon default.  In other words, [LAS] committed illegal acts separate and apart from the state court's entry of judgment against her (or any other class member) by misrepresenting both to

her and the state court that it had a right to collect interest on the overdraft debt. Thus, Liberty's alleged liability arises from separate and independent violations of federal law, not from any legal error made by the state court.

Id.

Judge Stewart distinguished District of Oregon cases relied on by LAS.  Id. at 8-9. Instead, she found a similar 2011 Southern District of California case persuasive.  Id. at 9 (discussing Martinez v. CACH, LLC, No. 10CV1625 DMS (JMA), 2011 WL 2560251 (S.D. Cal. June 17, 2011)).  Martinez, a class action FDCPA case, involved a "downstream debt collector suing consumers on debts allegedly purchased from a bank."  Id.  After acquiring the debt, the defendant sued the plaintiff in state court, claiming a right to collect 24.5% annual fixed interest on the underlying debt.  Id.  In the federal court case, the plaintiff alleged that by suing him in state court for an interest rate it had no right to collect, the defendant violated the FDCPA and its California state analog.  Id.

The defendant in Martinez moved to dismiss under Rooker-Feldman.  Id.  It argued that the federal suit was a collateral attack on the final state court judgments it had secured.  As Judge Stewart explained, "[t]he district court rejected that argument."  Id.  The plaintiff in Martinez claimed that the defendant "'became liable under the FDCPA . . . immediately upon filing of the state court complaint against Plaintiff and the putative class members and that any judgment obtained by [the defendant] against members of the putative class will remain undisturbed by this action.'"  Id. (quoting Martinez, 2011 WL 2560251, at *3) (brackets in July 29, 2015 F&R).

Judge Stewart compared Martinez to the FDCPA claim here.  She said:  "As the plaintiff in *Martinez*, Jenkins-Brown claims that by pursuing interest to which it has no legal right, [LAS] violated the FDCPA."  Id.  Like the plaintiff in Martinez, "Jenkins-Brown does not seek to

'disturb' the state court judgment, but seeks separate relief under the FDCPA." Id.  She

continued:

> Moreover, other courts have similarly declined to dismiss FDCPA claims based
> on *Rooker-Feldman* where a judgment on the debt had been entered in state court.
> *See, e.g., Cameron v. LR Credit 22, LLC*, 998 F Supp2d 293, 297 (SDNY 2014)
> (a claim that defendants used allegedly deceptive means to induce the plaintiff to
> agree to a settlement is independent of the state court judgment enforcing the
> settlement); *Foster v. D.B.S. Collection Agency*, 463 F Supp2d 783, 798 (SD Ohio
> 2006) (*Rooker-Feldman* does not bar FDCPA claim when plaintiffs' alleged
> injuries "are not the result of the state court judgments themselves, but rather from
> the allegedly illegal practices Defendants used to obtain those state court
> judgments.").

> Contrary to [LAS's] contention, Jenkins-Brown's request for damages does
> not seek to vacate or alter the state court judgment.  The Complaint seeks to
> recover "actual damages" including all interest paid and "charged but not paid"
> under 15 USC § 1692k(a)(1) and statutory damages under 15 USC §
> 1692(a)(2)(B).  It makes no mention of the principal overdraft debt, which was
> included in the state court complaint.  Thus, the damages requested reflect that the
> alleged injury is not simply "undoing" the state court judgment, which included
> the principal debt was well as pre- and post-judgment interest.  Instead, Jenkins-
> Brown and the class members seek damages resulting from [LAS's] illegal
> collection practices equal to the amount of illegal interest that [LAS] collected as
> a result of its false representations and unfair practices.

> For the foregoing reasons, *Rooker-Feldman* does not apply to bar Jenkins-
> Brown's claims.

Id. at 10.

Despite Judge Stewart's thorough discussion of the issue, LAS raises Rooker-Feldman

again.  LAS seizes on the following sentence in Judge Stewart's decision:  "the doctrine does not

apply when a federal plaintiff presents an independent claim that asserts 'as a legal wrong that an

adverse party engaged in conduct which prevented a federal plaintiff from presenting a claim in

court.'"  July 29, 2015 F&R at 7 (quoting Reusser, 525 F.3d at 859) (brackets omitted).  LAS

argues that Plaintiff here fails to prove that he and each class member were "PREVENTED from

24 - OPINION & ORDER

presenting a claim by LAS." LAS Opp. 14. LAS argues that in fact, the opposite is true because LAS sent Plaintiff a "Notice of Intent to File Written Application for Default" alerting him to LAS's intent to apply for a default order and judgment if no action were taken. LAS suggests that having been so informed, it did not prevent Plaintiff from raising a claim in state court. As such, LAS continues, the court must make individual determinations as to whether Rooker-Feldman applies as to each class member.

I agree with Plaintiff that LAS is "fixated' on the word "prevented" to the exclusion of Judge Stewart's overall rational. As Judge Stewart explained, the FDCPA claim here is neither a direct nor a *de facto* challenge to the state court judgment. It is not inextricably intertwined with that judgment because it raises questions about LAS's conduct, not error by the state court. And the damages sought do not undermine the state court judgment because, as Judge Stewart explained, they seek only an amount equal to the amount of contractual interest LAS allegedly unlawfully collected as a result of its alleged FDCPA violations and not the principal debt or other interest.

Additionally, Judge Stewart's quotation of Reusser which contained the "prevented a federal plaintiff from presenting his claim in court" language, while correct, does not apply in this context. Reusser and the case it relied on Kougasian v. TMSL, Inc., 359 F.3d 1136 (9th Cir. 2004), both involved allegations of extrinsic fraud. The plaintiffs in Reusser challenged a state court foreclosure on real property and argued that the bank had engaged in extrinsic fraud in causing that default judgment against them. 525 F.3d at 859. The Reusser court described the plaintiffs' argument in opposing the application of the Rooker-Feldman doctrine to their claims:

The Reussers rely on our holding in *Kougasian*, in which we held that *Rooker-*

25 - OPINION & ORDER

> *Feldman* does not bar a federal plaintiff from asserting as a legal wrong that an adverse party engaged in "conduct which prevent[ed] a [federal plaintiff] from presenting his claim in court." 359 F.3d at 1140 (quoting *Wood v. McWewen*, 644 F.2d 797, 801 (9th Cir. 1981) (per curiam)). The focus of such claim is not on whether a state court committed legal error, but rather on "a wrongful act by the adverse party." Id. at 1141.

Reusser, 525 F.3d at 859 (brackets in Reusser)..

Judge Stewart's decision quoted this passage accurately, omitting the citations. But, when one reads the underlying decision in Kougasian, it is clear that the Reusser court cobbled together distinct concepts, creating the misunderstanding that Rooker-Feldman is inapplicable *only* when an adverse party prevented a federal plaintiff from presenting the claim in state court.

Kougasian involved a claim that two prior judgments against the plaintiff had been obtained through extrinsic fraud on the court. 359 F.3d at 1139, 1140. The court generally described the Rooker-Feldman doctrine, summarizing its discussion by stating that Rooker-Feldman "applies only when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief from the state court judgment." Id. at 1140.

The Kougasian court went on to describe the claims at issue, noting that three of them were based in whole or in part on "alleged extrinsic fraud on the state court." Id. In describing the concept of "extrinsic fraud," the court stated: "[e]xtrinsic fraud is conduct which prevents a party from presenting his claim in court." Id. (internal quotation marks omitted). In the next paragraph, the court had moved on to discuss the application of Rooker-Feldman to claims of extrinsic fraud. There, the court further explained that a "plaintiff alleging extrinsic fraud on a state court is not alleging a legal error by the state court; rather, he or she is alleging a wrongful act by the adverse party." Id.

26 - OPINION & ORDER

When <u>Reusser</u> quoted <u>Kougasian</u> for the proposition that "<u>Rooker-Feldman</u> does not bar a federal plaintiff from asserting as a legal wrong that an adverse party engaged in conduct which prevent[ed] a [federal plaintiff] from presenting his claim in court [and the] focus of such claim is not on whether a state court committed legal error, but rather on a wrongful act by the adverse party," <u>Reusser</u> took the first portion of that quote from <u>Kougasian</u>'s definition of extrinsic fraud and the second portion from the separate following paragraph discussing <u>Rooker-Feldman</u>. <u>Reusser</u>'s combination of two separate concepts in one passage made it appear that "preventing a federal plaintiff from presenting his claim in [state] court" is required for the non-application of <u>Rooker-Feldman</u>. But, that is simply not the case and it was not an accurate description of <u>Kougasian</u>'s discussion or holding. Thus, as Judge Stewart has already held, <u>Rooker-Feldman</u> does not apply to Plaintiff's FDCPA claim and no individualized inquiries into its application are required.

### 2. Bankrupt Class Members

LAS states that the proposed class includes bankrupt judgments. In such cases, LAS argues, the debtor has no remedy because any asset of the debtor's belongs to the bankruptcy estate. Thus, LAS contends, the proposed class includes improper class members.

This is a damages argument, not a liability argument. As previously noted, individualized issues regarding damages do not preclude class certification. Other courts have reached similar conclusions regarding bankrupt debtors. In a 2012 decision, the Northern District of California relied on the reasoning of a 1998 Northern District of Illinois case. <u>Jordan v. Paul Fin., LLC</u>, 285 F.R.D. 435, 464 (N.D. Cal 2012) (discussing <u>Wilborn v. Dun & Bradstreet Corp.</u>, 180 F.R.D. 347 (N.D. Ill 1998)). The <u>Wilborn</u> court rejected the same argument that LAS makes here:

Although some class members may not be entitled to personally recover damages because their claims have become part of a bankruptcy estate, the common issues of law and fact regarding defendant's liability still predominate.  If damages are awarded, the bankruptcy status of each class member will have to be determined.  This determination regarding damages, however, need not require a highly fact-intensive inquiry, as defendant suggests.  Many if not most class members will not have filed bankruptcy.  As for those class members who have, determining whether they have exempted their claims against defendant should be a relatively straightforward matter.  The bankruptcy issue, therefore, does not preclude certification.

Wilborn, 180 F.R.D. at 356.

The Jordan court found this reasoning persuasive and "adopt[ed]" it.  285 F.R.D. at 464.

The Jordan court explained that a

defendant cannot defeat class certification by simply making an *ipse dixit* allegation that because of the economic downturn, many members of a class will likely be bankrupt; if it could, Rule 23 would be eviscerated.  Moreover, even if some members of the class have declared bankruptcy, determining their standing will be a relatively straightforward manner.

Id. at 463.

Like in Wilborn and Jordan, the fact that the proposed class includes bankrupt debtors does not affect the common questions of law and fact related to liability.  And to the extent the presence of such class members impacts individual assessments of damages, these issues can be resolved without overbearing complication.

### 3.  Arbitration Clause

Next, LAS argues that because the DDA Agreements contain an arbitration provision which may be invoked by any class member or by LAS, each class member must be given the individualized right to decide whether to exercise the arbitration provision.  Additionally, LAS points to a provision that prohibits disputes to be arbitrated on a class action basis.  LAS

28 - OPINION & ORDER

contends it has the right to enforce this class waiver clause as to each individual U.S. Bank DDA.

Judge Stewart previously discussed the arbitration provision. In her March 5, 2015 F&R, she first discussed whether there was a valid arbitration agreement between Jenkins-Brown and U.S. Bank. She then went on to explain that even if there were a valid agreement, it did not require arbitration of the FDCPA claim against LAS. Mar. 5, 2015 F&R at 9.

Judge Stewart first noted that the DDA Agreement's definition of "we" as U.S. Bank did "not expressly include future assignees or other downstream parties who may acquire rights under the DDA Agreement." Id. And, even if LAS could invoke the arbitration provision, Judge Stewart explained that arbitration was required only for disputes "concerning your account" and "the claim alleged in this case is not a dispute 'concerning your account.'" Id. The claim here is a dispute concerning debt collection practices, "not the DDAs that were closed by the banks long before [LAS] obtained any ability to collect them." Id. at 10. As Judge Stewart said, "[t]he DDA Agreement simply does not contemplate arbitration of FDCPA claims against a third-party downstream debt collector, and defendants' submissions have not shown otherwise. Thus, the claim alleged in this case is not a claim covered by the arbitration clause in the DDA Agreement." Id.

In opposing the class certification motion, LAS offers no argument that Judge Stewart's reasoning has lost validity. The arbitration provision does not apply to the FDCPA claim. There is no argument or evidence in the record on this motion that any member of the proposed class is party to an agreement with different provisions than those analyzed by Judge Stewart. Thus, no individualized inquiry is required.

/ / /

29 - OPINION & ORDER

4.  Different DDA Agreements

The Javlin Parties note that Plaintiff himself has submitted no executed copy of his DDA

Agreement or evidence that any putative class member signed an agreement.  They note that in

opposing LAS's motion to compel arbitration, Jenkins-Brown argued that LAS was unable to

prove that she signed the DDA Agreement and was thus unable to prove that Jenkins-Brown was

bound by the arbitration clause.  Based on that, the Javlin Parties argue that the record in the case

"illustrates disagreement among potential class members as to what precise DDA agreement

applies and whether certain provisions apply to all class members."  Javlin Parties' Opp. Mem.

13-14, ECF 129.  The Javlin Parties argue that because Plaintiff fails to establish that the DDA

Agreement he submits in support of the motion to certify is the same agreement that governed his

account or the accounts of other putative class members, certification should be denied.

In my opinion, Jenkins-Brown's previous position that LAS had failed, in support of its

arbitration motion, to establish that Jenkins-Brown had entered into the unsigned DDA

Agreement containing the arbitration clause, does not create a "disagreement among potential

class members" as to which DDA Agreement applies.  I also do not see the relevance of a dispute

over whether DDA Agreements were or were not signed by proposed class members.  LAS

sought to collect interest from Plaintiff and others at a purported contractual rate.  According to

LAS, the U.S. Bank DDA Agreements were the basis for its assertion of its right to collect that

contractual interest.  Mueller Decl., Scott Dep. Vol II, 39:1-24; see also Mueller Decl. Ex. 1

("Scott Dep. Vol I") 128:11-129:1, ECF 120-1 (account agreement designated Deposition Exhibit

5 is the only document indicating that U.S. Bank charged its account holders interest on its DDA

accounts and Scott unaware of any other document entitling LAS to collect interest on the U.S.

Bank DDA accounts).  In response to Plaintiff's request for production, LAS has provided

Plaintiff with U.S. Bank DDA account agreements and statements from U.S. Bank as to accounts

"to the extent they exist."  Mueller Decl. Ex. 13 at 8.  LAS has no other documents or

communications indicating that U.S. Bank charged its account holders interest on these accounts.

Id.

The record indicates that LAS relied on the U.S. Bank DDA Agreements for its right to

assert contractual interest on the debt.  The fact that Plaintiff or any other class member may or

may not have signed the DDA Agreement is not relevant to the issue of whether LAS's conduct

in seeking contractual interest violated the FDCPA.

Finally, on this issue, other than asserting that the record in the case somehow shows

disagreement about the DDA Agreements at issue, the Javlin Parties do not expressly assert that

the versions of the U.S. Bank account agreement that LAS produced to Plaintiff are not identical

regarding contractual interest.  Accordingly, I reject the argument that individualized inquiries

into each agreement are required to adjudicate the FDCPA claim.

### 5. Fraudulent Transfer Claim

The Javlin Parties argue that there is no commonality as to this claim because Plaintiff

fails to establish which state's law applies to the claim.  The Javlin Parties contend that it is

Plaintiff's burden to present a sufficient choice of law analysis to show that there are no conflicts

of law governing the claim. But, because Plaintiff's fraudulent transfer claim arises out of a single

fraudulent transfer from LAS and Holdings to the Javlin Parties, whatever state's law applies will

apply to all class members' claims.  Because there is a single transfer, there is no need to resolve

conflicts of law issues before class certification.  Although the putative class members reside in

different states, the applicable law will most likely be determined by the locations of the parties

to the transfer and those locations are not subject to individual class member inquiries.  Every

class member's fraudulent transfer claim will be adjudicated under the law of one jurisdiction.

      6.  Summary re:  Commonality

      Plaintiff establishes that there are many common issues of both fact and law for each of

the claims on which he seeks class certification.  These issues are capable of classwide resolution

because the U.S. Bank DDA Agreements contained the same interest provision, LAS's conduct

was the same in that it obtained the debt and then sought to collect on it including contractual

interest, and LAS acted in a substantially similar manner by sending letters, filing lawsuits, and

obtaining judgments.  As such, common proof will be available to determine if DDA Agreements

allowed for the collection of contractual interest and whether LAS's conduct violated the

FDCPA.  Additionally, on the fraudulent transfer claim, the law of one state will apply to the

claim and the conduct at issue is the same for all class members.

      Defendants raise only a few issues which could possibly require individual

determinations.  On the statutory interest issue, the allowance of a setoff generally will likely be

determined on a classwide basis.  Only if a setoff is appropriate will individual calculations be

necessary.  And, because that relates only to a damages analysis and is a straightforward

mathematical computation, the need for individual calculations does not defeat the

appropriateness of class certification.  Bankrupt debtors present another issue that could require

individual analysis, but this too is a damages issue and one that is likely to be limited in number.

In the event differing state claim or issue preclusion laws apply, which I doubt, the proposed

class can be subdivided by state at a later date.  Finally, other commonality arguments made by

32 - OPINION & ORDER

Defendants are unavailing. Plaintiff establishes the presence of common questions of both law and fact for both the FDCPA and fraudulent transfer claims.

    C. Typicality

    Rule 23 requires Plaintiff to establish that the class representative's claim is typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (internal quotation marks omitted). Under the "permissive standards" of Rule 23(a)(3), the "representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020.

    "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Wolin, 617 F.3d at 1175 (internal quotation marks omitted). Although the claims of the class representative need not be identical to the claims of other class members, the class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 156 (1982) (internal quotation marks omitted).

    Plaintiff argues that his FDCPA claim is typical of those of the proposed class members because they all arise out of the common conduct of seeking contractual interest on U.S. Bank DDA debt. Plaintiff's claim and those of the absent class members all contend that this common conduct violates the FDCPA. Plaintiff seeks actual and statutory damages with the actual damages equivalent to the allegedly unlawfully collected contractual interest collected from

Plaintiff and the class members.  Additionally, Plaintiff argues that his fraudulent transfer claim is typical of proposed class members' fraudulent transfer claims because all claims arise out of the LAS's and Holding's transfer of money to the Javlin Parties.

LAS argues that because Plaintiff is not an adequate representative, his FDCPA claim cannot be typical.  Adequacy is discussed below.  The Javlin Parties note that in his initial motion, Plaintiff failed to make a typicality argument regarding his fraudulent transfer claim and thus, fails to meet his burden of showing that his claim is typical of those of the proposed class. Plaintiff addresses the issue in his Reply Memorandum.

The Javlin Parties also argue that Plaintiff's claim is not typical because each putative class member will have to respond to an affirmative defense under § 1692k(c) which prohibits liability if "the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  15 U.S.C. § 1692k(c).  This is better understood as another commonality argument because the Javlin Parties do not argue that Plaintiff's claim is atypical in this regard, meaning that the conduct directed toward Plaintiff was not intentional but as to other DDA debt collection actions, it was.

What the Javlin Parties assert in essence is that there will be individualized inquiries as to this affirmative defense which would negate liability and thus, Plaintiff cannot establish commonality.  The record fails to establish any basis for concluding that LAS's and Holding's conduct differed from one account holder to another.  Thus, to the extent this is relevant at all, it will be determined on a classwide basis.  Plaintiff establishes that his claims are typical of those of the proposed class members.

34 - OPINION & ORDER

### D.  Adequacy

Rule 23(a)(4) requires the class representative(s) to fairly and adequately protect the interests of the class.  This factor requires:  (1) that the proposed representative plaintiff have no conflicts of interest with the proposed class; and (2) that plaintiffs are represented by qualified and competent counsel.  See Hanlon, 150 F.3d at 1020; Lerwill v. Inflight Motion Pictures, Inc., 582 F.2d 507, 512 (9th Cir. 1978) (describing two criteria for determining adequacy of representation:  "[f]irst, the named representatives must appear able to prosecute the action vigorously through qualified counsel, and second, the representatives must not have antagonistic or conflicting interests with the unnamed members of the class.").

Defendants challenge whether Plaintiff can be an adequate representative based on (1) his credibility; (2) lack of awareness of the events in the case; (3) financial inability to support the class; and (4) impediments to travel.

### 1.  Credibility

In September 2016, following a guilty plea, Plaintiff was convicted of a Class C felony of fleeing or attempting to elude a police officer and a misdemeanor charge of criminal mischief. Hasson Decl. Ex. 5, ECF 128-5.  The charges arose out of a 2015 automobile accident.  Pl. Decl. ¶ 6, ECF 135.  He was initially ordered to serve a consecutive ten-day sentence beginning October 13, 2016.  Hasson Decl. Ex. 5 at 2.  But, because Judge Beckerman was conducting a judicial settlement conference in this case on October 19, 2016, Plaintiff worked with his attorneys and probation officer to set over the start date of his sentence.  Pl. Decl. ¶ 6.  His request was granted and the sentencing date was extended.  Id.  He later was approved to serve his time as house arrest.  Id.  His home detention period runs from November 28, 2016 to

December 19, 2016 and he is permitted to go to and from work during that time.  Id.

LAS notes that although Plaintiff's counsel represented that Plaintiff would attend the October 19, 2016 settlement conference and although Judge Beckerman adjusted the start time to accommodate Plaintiff's flight schedule from Medford, Plaintiff did not appear.  LAS argues that Plaintiff's conviction and his failure to participate in the settlement conference "is the very essence of a proposed class representative that does not meet the credibility test."  LAS Opp. 21, ECF 127.

LAS's and the Javlin Parties' credibility arguments are premised in part on their assumption that Plaintiff failed to appear for the settlement conference because he was serving his ten-day jail sentence.  That assumption was incorrect.[9]  As Plaintiff explained, he worked to set over his surrender date and was available to participate in the conference.  Plaintiff further explains that on October 19, 2016, he took the day off from work and arrived at the Medford airport thirty minutes before his 7:30 a.m., flight to Portland.  Pl. Decl. ¶ 7.  Because, as he explains it, the desk agent had already gone to the departure gate, he could not timely obtain a boarding pass and could not get through security and to the gate in time for the flight.  Id.  He learned he could take another flight later in the day, through Seattle, and arrive in Portland in the afternoon.  Id.  He then learned that Judge Beckerman did not believe it was worth the effort to fly later in the day.  Id.  At that point, he made himself available to discuss the details of any settlement that might have been negotiated.  Id.  Because Plaintiff's failure to attend the settlement conference was not related to his conviction or any reason that shows a lack of

---

[9]  According to Plaintiff's counsel, Defendants' counsel never contacted any of Plaintiff's counsel to inquire if Plaintiff was incarcerated on the day of the settlement conference.  Supp'l Mueller Decl. ¶ 9, ECF 134.

commitment to the case, it is not relevant to the issue of whether he will be an adequate representative of the class.

Defendants' credibility argument is also based on the fact of Plaintiff's recent felony conviction. "Courts have held that prior criminal convictions can show dishonesty and can be a basis to bar an individual from acting as a class representative." Larson v. Trans Union, LLC, No. 12-CV-05726-WHO, 2015 WL 3945052, at *12 (N.D. Cal. June 26, 2015) (internal quotation marks and brackets omitted). However, "'[f]or an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility,' thereby adversely impacting the claims of absent class members." Id. at *13 (quoting CE Design Ltd. v. King Architectural Metals, Inc., 637 F.3d 721, 728 (7th Cir. 2011)).

Plaintiff argues that first, his convictions should not be admitted and thus, there is no admissible evidence undermining his credibility. He notes that neither of the offenses involves a dishonest act or false statement and that only the conviction for attempting to elude a police officer is even arguably admissible. As to that conviction, he notes that it has no bearing on his honesty and no bearing on the facts of the case. While admissible under Federal Rule of Evidence 609(a)(1)(A), the evidence is still subject to Rule 403. Given that the charge did not impugn his truthfulness and does not impeach any specific testimony he has about LAS's and Holdings's debt collection practices, he argues that it would have no probative value and be outweighed by the danger of undue prejudice.

I agree with Plaintiff that his convictions, while not to be taken lightly, would not so

37 - OPINION & ORDER

severely undermine his credibility that a factfinder would focus on his credibility instead of the merits of the claims to the detriment of class members.  For the reasons noted by Plaintiff regarding the fact that the conviction does not involve a dishonest act, false statement, or specific testimony about the claims here, the conviction will not lead the jury's attention away from the facts related to the actual claims.

2.  Knowledge of the Case

LAS and the Javlin Parties argue that Plaintiff's deposition testimony shows he has no knowledge about the case such that he is "startlingly unfamiliar" with it.  LAS Opp. 22.  They contend that he does not possess sufficient knowledge to be an adequate representative.

A recent case from the Northern District of California explained:

> Courts have found class representatives inadequate where the plaintiff knew nothing about the case and completely relied on counsel to direct the litigation. Put another way, the threshold of knowledge required to qualify as a class representative is low; a party must be familiar with the basic elements of her claim, and will be deemed inadequate only if she is startlingly unfamiliar with the case. It is not necessary that a representative be intimately familiar with every factual and legal issue in the case[;] rather, it is enough that the representative understand the gravamen of the claim.  Given this standard, class representatives are given some leeway when it comes to knowledge of and participation in their case: in the FDCPA context, courts have allowed a class representative to proceed even where she could not recall the exact nature of her debts, and where he was unable to identify all defendants.  However, where the class representative knows nothing about the case and defers control over the action to counsel, he is inadequate.

Lee v. Pep Boys-Manny Moe & Jack of Cal., No. 12-CV-05064-JSC, 2015 WL 9480475, at *10 (N.D. Cal. Dec. 23, 2015) (citations, internal quotation marks, and brackets omitted).

In answering questions at his deposition, Plaintiff stated at the start that he had reviewed all of the important documents in the case both before and in preparation for his deposition, even

38 - OPINION & ORDER

though he could not provide the precise names of the documents.  Supp'l Mueller Decl. Ex. 1 (Pl.

Dep.) 16:21-17:21, ECF 134-1.  His counsel are in the practice of emailing him case documents

and he looks through them.  Id. 17:19-21.  Later, he testified that he was unsure if he had seen a

copy of the First Amended Complaint, but then said that he had seen "all these ones" that showed

his counsel's names on them.  Hasson Decl. Ex. 6 (Pl. Dep.) 83:1-10, ECF 128-6.  He could not

recall the exact date of when he had first seen the First Amended Complaint.  Id. 83:11-14.  He

also explained that because he had been looking through so many documents in preparation for

his deposition, he could not recall if he had looked at the First Amended Complaint as part of

that preparation.  Id. 83:15-19.  He thought he had seen it briefly.  Id. 83: 20-24.  He then recalled

with more certainty that he had received it and remembered seeing it.  Id. 84:3-7.  He accurately

described it as the First Amended Class Action "allegation complaint."  Id. 84:9-10.  In

describing its purpose, he said it was to "get all the people that were hurt by this . . . if somebody

has any sort of complaint, then they – you know, you take it to court."  Id. 84:12-19.  He did not

know how to specifically describe the document's legal purpose, stating that his lawyers try to

clarify such things for him.  Id. 84:20-24.

Plaintiff was unable to state exactly which court-filed documents he had reviewed

regarding the case.  Id. 85:10-15.  He said he had seen documents "that were in the beginning"

and an agreement between his counsel and himself.  Id. 85:13-24.  In response to a question

asking what court-filed documents he had seen, and in particular, if he had received the First

Amended Complaint, he said that he was not "100 percent sure if this is the one I saw or not."  Id.

86:4-13.  If he received it, he could not recall when.  Id. 86:24-87:2.

He recalled seeing documents with the word "motion" although he could not recall what

type of motion.  Id. 86:3-11.  He could not remember seeing a document with the word "Order" as it related to the federal action.  Id. 86:12-15.  He knew that an answer was a response, but was not sure if he had received a copy of an answer.  Id. 87:16-24.  Upon clarification, he stated that he did not know what a legal document called an "answer" was.  Id. 88:2-8.  He was not 100% sure if he had seen the Answer in this federal action.  Id. 88:9-12.  He did not know what discovery requests are generally.  Id. 88:17-20.  He was unfamiliar with what initial disclosures are.  Id. 102:20-21.  He did not know if any settlement "overtures" or attempts had been made in the case.  Id. 104:24-105:9.

In describing Defendants, Plaintiff identified LAS as a debt collector and Holdings as being "the ones above [LAS]."  Buescher Decl. Ex. B (Pl. Dep.) 10:1-14, ECF 129-3.  Javlin One was a "company that [LAS] works with" and Javlin Capital was "above" Javlin One.  Id. 10:18-11:4.  When asked what the action was about, Plaintiff said:  "It's about Liberty, basically, they harmed a lot of people, including myself, for taking interest on an account they weren't supposed to."  Id. 11:12-18.  He later said that they charged people and took "interest on accounts that they weren't supposed to take the interest."  Id. 12:12-17.  Plaintiff believed that LAS was not entitled to collect the interest because U.S. Bank was not charging for interest on the account.  Id. 12:21-13:12.  Plaintiff first learned that LAS was taking interest they were not supposed to be taking in a letter from counsel Kelly Jones.  Id. 13:13-24.

As to his role as class representative, Plaintiff explained that he was "here to represent the class action.  I'm here to represent everybody that got harmed."  Id. 15:19-21.  He could not describe any particular duties associated with that role other than to repeat that he was here to represent every person who was harmed.  Id. 15:22-16:2.  Plaintiff testified that he was prepared

"to do whatever it takes to keep going forward with this case."  Supp'l Mueller Decl. Ex. 1 (Pl.

Dep.) 102:3-19

     In his Declaration, Plaintiff states that since the case began, he has been in regular contact

with his lawyers, receives updates from them about the status, and reviews key documents filed

in the case.  Pl. Decl. ¶ 2.  He took the day off from work to travel to Portland for his deposition

and although missing work is hard on him financially, he is committed to the lawsuit and will do

"whatever it takes to advance the case."  Id.  He described being asked many questions by LAS's

counsel during his deposition about the names of different documents filed in the lawsuit.  Id. ¶

3.  He states he is not a lawyer and does not understand the technical names given to the different

documents.  Id.  However, he states: "I do understand that this lawsuit seeks to hold the

defendants responsible for taking improper interest from me and all other class members, and I

am committed to doing what is necessary to hold defendants responsible for their conduct."  Id.

     He adds that his duty as a class representative is to protect the interests of all of the

people who were hurt by LAS's illegal conduct and not just pursue his own individual interests.

Id. ¶ 5.  He repeats that as the proposed class representative, he has been in regular contact with

his lawyers about the case, has been deposed, and is willing to travel to Portland and testify at

trial.  Id.  He also knows that any class settlement must be approved by the Court.  Id.

     Defendants raise legitimate concerns regarding Plaintiff's knowledge.  However, while

Plaintiff could certainly possess more information about names of documents, more specific

information about his duties as class representative, and a more sophisticated understanding of

the litigation process, his knowledge is not so deficient as to establish that he has abdicated his

role to his attorneys.  The concern is when the class representative possesses so little

understanding of the claim and participates so little in the litigation that class counsel effectively controls the case and there is no one to protect the interests of the class members whose interests could be adverse to counsel.  In <u>Lee</u>, the court expressed concern over what it described as "conclusory" statements by the Plaintiff in his declaration that he understood the duties of a class representative, had been and would continue to be willing to assist in the investigation of the matter, had made himself available for deposition, and would be available for trial.  <u>Lee</u>, 2015 WL 9480475, at *11.  The court noted that "Plaintiff was able to explain in the most general terms his class representative role and the nature of his claims" by testifying that he was "just representing the people who got this letter" because it was unfair and used terms he did not understand.  <u>Id.</u>

But, the court was quite concerned with testimony showing that the plaintiff did not know that the client is supposed to control the litigation.  <u>Id.</u>  The court also noted that the plaintiff had "never read the complaint," had "never read any of the pleadings or the discovery," was "ignorant of the procedural aspects of class action litigation," "believe[ed] that the next thing that will happen in the case is that he and the class will receive money," and also "did not know that any mediation had ever occurred."  <u>Id.</u>

In the end, the court's rejection of the plaintiff's adequacy focused on the fact that his "sole participation" had been reviewing an initial settlement demand letter with his attorneys and attending his deposition.  <u>Id.</u>  The court found especially troubling that the plaintiff was unaware of any mediation efforts to date and concluded that the plaintiff appeared to have deferred control over this litigation to his attorneys.  <u>Id.</u>

In contrast to the plaintiff in <u>Lee</u>, Plaintiff here has reviewed all of the important

42 - OPINION & ORDER

documents in the case, including the First Amended Complaint. His unfamiliarity with the names of the various documents does not equate to a lack of participation. He was able to describe the claim accurately and while he did not use terms such as "alter ego," he was able to describe the relationship of Holdings as being "above" LAS suggesting he understood the concept of control by Holdings of LAS's actions. He knew that the Javlin Parties were related to LAS and Holdings. He attended his deposition and was prepared to attend the October 19, 2016 settlement conference. When he was unable to make his original flight, he was then discouraged by Judge Beckerman from taking one later in the day. He nonetheless made himself available as best he could. He is in regular contact with his attorneys through email.

The Javlin Parties make much of Plaintiff's deposition testimony that he was unaware if any settlement discussions had occurred in the case. They contend that like the plaintiff in <u>Lee</u>, this suggests that he has given control of the litigation to his attorneys. Javlin Opp. 32-33. But, Plaintiff's counsel states that at the time Plaintiff was deposed, there had been no settlement offers made by Defendants. Supp'l Mueller Decl. ¶ 8. Thus, there were no settlement discussions of which Plaintiff could have been aware.

Plaintiff is a seemingly unsophisticated, inexperienced litigant. That does not made him unknowledgeable about the case or inherently suggest that he will not participate in the litigation. His knowledge, while not detailed, along with his commitment to participate, are sufficient to show that he will not abdicate his class representative responsibilities to counsel.

/ / /

/ / /

/ / /

43 - OPINION & ORDER

3.  Finances & Ability to Travel

Defendants argue that the loss of Plaintiff's driving privileges[10] renders him incapable of being an adequate representative because he lives five hours from Portland.  Further, they argue that a $200,000 restitution order entered against him in connection with his September 2016 conviction[11] means he has no financial ability to finance a class action, negatively impacting his ability to represent class members.

In his Declaration, Plaintiff states that although he does not drive, he has the ability to get to the local airport and has access to taxis, ride-sharing services, busses, and other forms of public transportation.  Pl. Decl. ¶ 3.  Plaintiff notes that he successfully traveled to Portland for his deposition despite not having a driver's license.  Plaintiff also argues that despite Defendants' citation to Oregon Rule of Professional Conduct 1.8(e) for the proposition that Plaintiff's counsel cannot provide financial assistance to Plaintiff in connection with the lawsuit other than limited exceptions, the rule expressly allows an attorney to "advance court costs and expenses of litigation, the repayment of which may be contingent on the outcome of the matter."  Or. R. Prof. Conduct 1.8(e)(1).  I agree with Plaintiff that given this ability, Plaintiff's personal financial resources are irrelevant.  And given the other modes of transportation available to him, as well as technology allowing for easy email and Skype communication, his inability to drive does not make him an inadequate representative.

As to Plaintiff's counsel, Defendants raise no argument that they are not qualified or

---

[10]  As part of his September 2016 conviction, Plaintiff's driver's license was suspended for ninety months.  Hasson Decl. Ex. 5.

[11]  Hasson Decl. Ex. 5.

experienced.  Plaintiff's counsel have significant experience in class litigation as well as FDCPA

and other consumer protection litigation.  Mueller Decl. ¶¶ 19-21; Jones Decl. ¶¶ 4-5, ECF 121.

There is no indication that Plaintiff's counsel are unable to represent the class through long-term

class litigation.  Plaintiff satisfies the adequacy requirement.

II.  Rule 23(b)

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  Amchem Prods., Inc. v. Windsor, 521 U.S.

591, 623 (1997).

> Rule 23(b)(3) focuses on the relationship between the common and individual
> issues.  When common questions present a significant aspect of the case and they
> can be resolved for all members of the class in a single adjudication, there is clear
> justification for handling the dispute on a representative rather than on an
> individual basis.

Hanlon, 150 F.3d at 1022 (internal quotation marks omitted).  Rule 23(b)(3) provides a

non-exhaustive list of factors to consider in determining superiority:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against members of the class; (C) the
> desirability or undesirability of concentrating the litigation of the claims in the
> particular forum; [and] (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Plaintiffs need not establish that there are no individual issues, only that the class issues

predominate and that a class action is superior.  See Local Joint Exec. Bd. of Culinary/Bartender

Trust Fund v. Las Vegas Sands, Inc., 244 F.3d 1152, 1163 (9th Cir. 2001) (concluding that

"given the number and importance of the common issues," some variation among the individual

employees in proving damages, as well as some potential difficulty in proof in demonstrating that

45 - OPINION & ORDER

they would have worked on a holiday, was not "enough to defeat predominance under Rule 23(b)(3)."); see also Kamar v. Radio Shack Corp., 254 F.R.D. 387, 399 (C.D. Cal. 2008) ("the existence of certain individualized or deviating facts will not preclude certification if most class members were subjected to a company policy in a way that gives rise to consistent liability or lack thereof. . . . Individual issues do not render class certification inappropriate so long as such issues may effectively be managed") (internal quotation marks omitted), aff'd, 375 F. App'x 734 (9th Cir. 2010).

Plaintiff notes that "the FDCPA specifically authorizes class actions." del Campo v. Am. Corrective Counseling Servs., Inc., 254 F.R.D. 585, 596-97 (N.D. Cal. 2008) (citing 15 U.S.C. § 1692k(a)(2)). Thus, Plaintiff argues, class actions are plainly a superior method for adjudicating FDCPA claims which often involve small individual damages claims. E.g., Gold v. Midland Credit Mgmt., Inc., 306 F.R.D. 623, 634 (N.D. Cal. 2014) (finding a class action superior under Rule 23(b)(3) and agreeing with the plaintiff that "individual recovery [under the FDCPA] is small, and resorting to alternative mechanisms would be unduly inefficient"); Hunt v. Check Recovery Sys., Inc., 241 F.R.D. 505, 515 (N.D. Cal. 2007) ("the size of any individual damages claims under the FDCPA are usually so small that there is little incentive to sue individually"), modified, 2007 WL 2220972 (N.D. Cal. Aug. 1, 2007).

The amount of statutory damages potentially recoverable by each class member in an individual action is $1,000. 15 U.S.C. § 1692k(a)(2)(A). Plaintiff estimates that as for actual damages, the records show that the most LAS collected from any potential class member is approximately $11,000 which includes principal. Mueller Decl. ¶ 18. The total collected was much less for the majority of cases. Id. (stating that records showed LAS collected $5,000 or

more from fewer than 40 of 17,000 individuals).  The actual damages, limited to an amount equivalent to the allegedly unlawfully-collected contractual interest, would be a fraction of the amount that LAS collected from an individual.

Based on the data, Plaintiff argues that the relatively small amount of damages any putative class member is likely to recover in an individual action compared to the expense of litigation makes it economically unviable for class members to pursue their claims individually. Thus, litigating the claims through a class action is superior to leaving the class members without a viable way of bringing their claims.

Plaintiff adds that it is desirable to concentrate the litigation in a single forum to avoid the potential for inconsistent results, decrease the expenses of litigation, and promote judicial economy.  Further, Plaintiff contends that class treatment of the claims is manageable.  The proposed class is composed of a well-defined group whose identities are already known to LAS. Common evidence such as the U.S. Bank DDA Agreements and LAS's own business records will establish liability.  Thus, Plaintiff argues that a class action is a superior method for fairly and efficiently adjudicating the claims of members of the proposed class.

In opposing the motion, the Javlin Parties largely rely on the arguments they previously made contesting commonality under Rule 23(a)(2).  See Javlin Opp. 25-30.  For the reasons explained above, none of those arguments presents a serious concern that individual issues will predominate.

LAS and Holdings, however, suggest that a class adjudication is not a superior method in this case because LAS has zero assets which means the class members will recover no damages. LAS states that it has assigned the judgments it obtained against the debtors to a third party.

47 - OPINION & ORDER

Hasson Decl. Ex. 1, Scott Dep. Vol I, 108:5-109:23 (explaining that after the December 2014

asset sale, Holdings did not sell the U.S. Bank DDAs but contracted with a third party collection

agency named Wakefield & Associates to continue collection efforts on those accounts).  LAS

argues that a "class judgment for excessive interest would release the judgments [assigned to

Wakefield for collection] for purported excessive interest from further liability." LAS Opp. 26.

That is, if a class-based judgment in the proposed class's favor in this action is obtained, that

would be the class members' only remedy because the class-based judgment would prevent or

"release" each individual class member from individually contesting the excessive interest.

LAS argues that in obtaining a class-based judgment in exchange for the right to contest

the excessive interest charge individually, the class members will give up their individual right

for nothing.  The "nothing" is because, LAS argues, it has zero net worth and its insurance policy

does not cover an award of damages in this case.  It argues that when the potential for minimal or

no recovery is considered in relation to the large costs in time, effort, and burdens on the court

created by a class action, the class action is not a superior method for adjudication of the claims.

"It is not in the best interests of the class members to take away their individual FDCPA actions

when the class members would receive nothing in return."  LAS Opp. 27.

There are two problems with this argument.  The first is that LAS's assertion of zero net

worth leading to the inability of class members to obtain any relief is a premature determination

and is in conflict with the allegations and evidence supporting the argument that Holdings itself

may be liable on the FDCPA claim.  As further explained below, I reject Holdings's separate

argument that no class should be certified on the FDCPA claim as to Holdings.  The allegations

and record submitted in connection with this motion are enough to implicate Holdings as a

48 - OPINION & ORDER

potential source of damages recovery for LAS's collection conduct.  Moreover, if the class

prevails on the fraudulent transfer claim, the class can look to the Javlin Parties to obtain any

damages awarded against LAS that LAS is unable to pay.  For these same reasons, I do not make

a determination about LAS's insurance coverage.  Even if LAS is unable to pay a judgment from

its own assets or insurance coverage, other sources of payment of damages are enough to refute

LAS's argument.

      Second, as Plaintiff notes, if the class obtained a judgment in this action, future attempts

to obtain contractual interest on the U.S. Bank DDAs by Wakefield would constitute new

violations of the FDCPA which would give rise to a new claim for each class member.  Thus, a

judgment in the class action would not "release" any claims that will arise in the future.  While a

class judgment here would preclude a class member from pursuing an individual claim for past-

collection efforts, the likelihood of a class member getting no damages award (assuming the class

establishes liability) in exchange for giving up the individual claim is, for the reasons explained

in the prior paragraph, not so negligible as to outweigh the class action as a superior method of

adjudication.

      The common issues in this case predominate over any individual issues and a class action

is a superior method for adjudicating the FDCPA and fraudulent transfer claims.  The liability

issues on the FDCPA claim against both LAS and Holdings raise common questions but more

importantly, resolution of the claim will require common proof and common answers.  Because

the U.S. Bank DDA Agreements appear to include the same provision on interest, determining

whether the agreements allowed contractual interest will resolve that issue for all class members.

Common proof will determine Holdings's liability.  Common proof will be used to assess

whether LAS's conduct violated the FDCPA.  On the fraudulent transfer claim, common proof will be used to determine Defendants' liability.

As explained above in the section discussing commonality under Rule 23(a)(2), while there is potential for some individual inquiries, they are primarily related to damages, not liability, and they are not so numerous or significant to defeat the predominance of the common issues.  Moreover, to the extent they exist, they can be easily managed.

III.  Holdings's Separate Argument

Holdings argues that no class should be certified as to the claims against it.  It argues that the FDCPA claim addresses only LAS's conduct, not Holdings's conduct.  Any determination of whether LAS's conduct violated the FDCPA will have no effect on Holdings's liability to the putative class.

At this point, although a "rigorous analysis" of Rule 23 is required before allowing certification, the Court also takes the substantive allegations of the First Amended Complaint as true and should not inquire into the merits.  The allegations in the First Amended Complaint and the evidence in the record are sufficient to allow the class to be certified, if otherwise appropriate, as to the FDCPA claim against Holdings.

In the First Amended Complaint, Plaintiff alleges that Holdings had the ability to, and did in fact maintain, control over LAS.  First Am. Compl. ¶ 7; see also id. ¶ 38.  LAS acted on behalf of Holdings in collecting and attempts to collect consumer debt.  Id.  Further, as noted earlier, Scott's deposition testimony on behalf of LAS establishes that Holdings was the sole member of LAS, as well as the other Liberty entities.  Scott also testified that the sole purpose of Holdings, Liberty I, and Liberty II is to be involved in "Liberty's" debt collection business.  Supp'l Mueller

50 - OPINION & ORDER

Decl. Ex. 5 (Scott Dep. Vol. I) 82:10-22, ECF 134-5.  Scott indicated that LAS, Holdings, and

the other Liberty entities as "one and the same."  Id. at 209:7-9.  Further, he testified that

Holdings's advisory board reviewed and approved LAS's recommendations regarding the

acquisition of debts that LAS serviced, at least as to debt acquisition above a certain threshold.

Supp'l Mueller Decl. Ex. 4 (Scott Dep. Vol II) 148:9-154:7.[12]

The allegations and testimony are sufficient at this stage to suggest that Holdings may

itself be a debt collector under the FDCPA or alternatively, be liable on the claim because it is

LAS's alter ego.  Therefore, class certification as to the FDCPA claim against Holdings is

warranted.

CONCLUSION

Plaintiff's motion for class certification [119] is granted.

IT IS SO ORDERED.

Dated this _____ day of _____, 2017

_____
Marco A. Hernandez
United States District Judge

---

[12]  Plaintiff asserts that Scott also testified that Holdings's advisory board "oversaw the activities of Liberty."  Plaintiff cites to pages 174-175 of Volume I of Scott's deposition in support.  Those pages do not appear to have been included in the record.

51 - OPINION & ORDER